## ATWOOD'S HEIRS vs. BECK, Admr.*

1. It is at least very questionable, whether slavery, as it exists among us, was not at one period recognized in England by the common law.

2. Slaves are now regarded by our law as chattels, and their owners have an absolute, unqualified property in them ; and although this right may not have been recognized by the ancient common law, yet such is the genius and expansive nature of the common law, that it adapts itself to the necessities and exigencies of society, and when a new species of property is introduced, and the statute law is silent as to the rules by which it is to be governed, the rules of the common law are applied to it, modified, of course, according to the nature of the property.

3. As between master and slave, aside from all statutory prohibition, the right of manumission exists, and is deducible not only from the absolute ownership of the master in his slave as a chattel, but from analogous rules applicable to slavery as it has obtained in every civilized country.

4. The constitutional provision respecting the emancipation of slaves, and the several statutes in relation thereto, amount to a prohibition of the right of emancipation in this State, except in the mode pointed out by statute.

5. Questions of State policy can only be determined by the courts, from the provisions of the Constitution and the acts of the Legislature.

6. There is no restriction or prohibition, in the Constitution, the statutes or the decisions of this State, upon the power of the owner to remove his slaves to a non-slaveholding State, by himself, his agent or his personal representative.

7. A bequest to certain slaves was as follows : " To each and all of the before-mentioned children I give and bequeath the sum of $8000 each, to be appropriated and invested in such manner as hereafter described, the same being invested in the hands of my executors, for the special benefit of the said children as aforesaid ; and the bondage and slavery to which said children, by the laws of the State, are subjected, I hereby invest in the hands of my executors, for the purpose of my said executors removing said children, viz: (naming them) to a free State ; the others, to-wit: (naming them) being already in a free State, from which they are not to be removed into any slave State; it being my desire to give to each and all of the children before-named their freedom, as also the sum of $8000, to be invested as hereinafter named," viz: one-half in lands in Indiana, Illinois or Michigan, and the other half to be loaned out on good individual security, additionally secured by mortgage on real estate ; the titles to said lands, and the bonds for said moneys, to be delivered to the said legatees, when they shall have been removed to a non-slaveholding State. *Held* :

   That the legacies and trusts were valid, as to all the negroes ; and that the Court of Chancery will not interfere, at the suit of the testator's residuary legatee, to prevent the trustee from carrying out the lawful desire of the testator.

---

* This case and all the following cases in this volume were submitted at the June term, 1852, but the opinions were not pronounced until after the resignation of DARGAN, C. J. REPORTER.

8. Land warrants, granted under the acts of Congress, unless specifically devised, pass to the heirs at law.
9. Only such real estate as is owned by the testator at the time of the execution of his will passes under it.

ERROR to the Chancery Court of Wilcox.

Heard before the Hon. J. W. LESESNE.

This was a bill filed by the heirs of Henry S. Atwood, alleging that, on the third day of August, 1843, said Atwood executed his last will and testament, a copy of which is attached to the bill, whereby he made certain bequests and dispositions of all property owned by him at the date of said will; that he appointed James Cootes and Jonathan Hagle his executors, and in the event of their death or refusal to act, he appointed Timothy W. Matthews and Robert Hall; that said Atwood departed this life in September, 1851, possessed of an estate consisting of choses in action and personal and real estate, estimated in value at the sum of three or four hundred thousand dollars; that said will was admitted to probate in Wilcox county, in which county said Atwood resided next before his death, on the 14th day of October, 1851; that the executors named refused to qualify, and Calvin C. Sellers and Franklin K. Beck were appointed administrators, with the will annexed; that complainants resided in Wisconsin, and did not assert their right as next of kin; that the administrators, having entered into bond and duly qualified, proceeded to obtain an order from the Probate Court for a sale of the cotton crop on hand, amounting to some eight hundred bales, and also all the perishable property of every description, on a credit of twelve months; also an order for the sale of one hundred of the slaves for cash, and one hundred and seventy-five more on a credit of twelve months, at public auction; that said property has been sold under said order, and the proceeds of the sale, less the sums which the administrators may have paid towards discharging the debts of the deceased, are now in their hands; that the sum thus left in the hands of the administrators after paying all the just debts of the deceased, amounts to one hundred thousand dollars or more, besides certain land warrants charged to be of great value. Complainants charge that this

money, with the land warrants, is subject to distribution among the children of Sally C. Northrop, who are the legatees of the *residuum* of the estate of said Atwood, and they pray that the same may be so distributed.

The bill further charges, that the real property owned by said testator at the date of the will, and the personal property then owned or since acquired by him, are charged with the payment of his just debts and vested legacies, if any; and that the real property acquired by the testator subsequent to the date of the will, vested in his heirs at law, who are Sally C. Northrop and Hannah M. Worster, and they pray the court so to decree; that according to one of the provisions of the will of said Atwood, certain slaves therein named were left in trust, "coupled with conditions, limitations and restrictions, contained and particularly set forth in said will, to be manumitted and set free from bondage, and a legacy of eight thousand dollars paid to each, to be invested for their benefit in the manner set forth in said will."

The complainants charge that, "they are willing and anxious to carry into effect all the provisions of the will of said Henry S. Atwood, so far as it can be done in conformity with the laws of Alabama, and as shall appear to the court, on final hearing of the cause, to be most consonant to equity and good conscience. But they charge, on information and belief, that the bequests in favor of said slaves, as well as the legacies directed to be invested for their benefit in the manner pointed out by the will, are absolutely void, and if this be so, they pray that the said legacies be declared void, and that the slaves be distributed among those entitled to the same; that if the bequests relating to the manumission of the slaves, and the investing of eight thousand dollars for each of them, be declared valid by the court, the complainants, Harson Northrop, Marshall A. Northrop and Sally C. Northrop, pray they may be appointed the guardians and trustees of said slaves, upon such terms and conditions and with such instructions as the court may prescribe; and they urge, as reasons for this application: first, the trustees to whom the power of manumission was given by the testator have declined to act; second, that the applicants are residents of a free State, and could carry the slaves and settle them in

the State of their residence at less expense than any one else; thirdly, they would feel bound, by the ties of blood as well as those of justice and humanity, to carry into full and complete execution what was the intention of said Atwood, deceased, who took two of said slaves, Alexander and Anny, to the State of Ohio in his lifetime; that one of said slaves, Cebille, has died, since the date of the will, and that those now remaining in Alabama are John, Sidney, William and Daniel, and that they have been hired by said Harson and Marshall A. Northrop to remain in their possession until a decision of the Chancery Court can be had."

Complainants "also pray a decree in relation to the other slaves intended to be emancipated by said Atwood, and the legacies left to them; and that the court will pronounce a decree as to each of the trusts contained in said will, and make all necessary orders in relation to them."

The bill prays a discovery from the administrators as to the lands, muniments of title thereto; also the personal property, and that they furnish an account of all the effects which have come to their knowledge or possession, and that said estate be fully administered in said Court of Chancery; that the trusts and limitations connected with the bequests and legacies to Sally C. Northrop and her children, be declared void, and that the legacies to each of them be paid in money, and that guardians for such as are infants be appointed to protect their rights.

The bill concludes with a prayer for general directions with respect to the various trusts contained in the will, and for general relief.

The will of said Atwood contains the following provisions: "I give and bequeath to a mulatto boy named Alexander, aged about fifteen years, also to his sister, a mulatto girl aged about twelve years, named Ann, who are now residing in the State of Ohio, in charge of Lemuel Brown, near Aberdeen, in Adams county; also to their sister, named Cebille, aged about nine years, also to her brother, named Julius, aged about eight years, also to his brother, John, aged about five years, the three latter children being on my plantation, near Prairie Bluff, and all of the aforesaid children, namely, Alexander, Ann, Cebille, Julius and John, being children of a

negro woman belonging to me, and known by the name of Candis; I also give and bequeath to a mulatto boy, named William, aged about six years, and to his brother Daniel, aged less than one year, both being children of a slave of mine named Mary, who resides at my plantation at Chilachi, six miles from Prairie Bluff; to each and all of the before mentioned children, I give and bequeath the sum of eight thousand dollars each, to be appropriated and invested in such manner as hereafter described; the same being invested in the hands of my executors, hereinafter named, for the special benefit of the said children as aforesaid; and the bondage and slavery to which said children, by the laws of the State, are subjected, I hereby invest in the hands of my executors, as hereinafter named, for the purpose of my said executors removing said children as aforesaid, viz: Cebille, Julius, John, William and Daniel, to a free State; the other two, to-wit: Alexander and Ann, being already in a free State, from which they are not to be removed into any slave State, it being my desire to give to each and all of the children before named their freedom, as also the sum of eight thousand dollars each, to be invested as hereinafter named. I also will and bequeath to nine of my servants their freedom, and hereby invest in my said executors, as hereinafter named, the control and ownership of said negroes, so far as it may be necessary to remove the said slaves to a free State, which shall be done as soon as practicable, and at furthest in one year after the probate of this will. The said slaves whom I wish to be liberated and removed, as aforesaid, are Candis, a woman, aged about thirty-six, she being the mother of five of the children before mentioned, and her two black children, to-wit: Jesse, aged about eighteen years, and Lucy, her daughter, aged about fifteen years; also a man named Seaborn, aged about twenty-seven years, and four small children of his by a woman named Milly, to-wit: Lucy, Betsy, Nancy and Wyatt. To the aforesaid Candis, Seaborn and Mary I give and bequeath the sum of two thousand dollars each, to be invested in them, in part, say one half, in lands in one of the free States to which they may be removed, and the balance, say one thousand dollars each, of the aforesaid legacies, to be loaned out and well secured by bond and mort-

gage on real estate, to be located in the vicinity of where they may locate, the interest to be payable to them semi-annually. The expense of removing all the aforesaid persons to be borne by my estate, and the means furnished them for a six months' supply of provisions at the expense of my estate after they arrive there. All the personal effects they have in possession here, to be and belong unto them, and if they are not furnished with beds and clothing, to be so furnished from my effects before emigrating."

"I give and bequeath to my executors the sum of two thousand dollars, to be appropriated to the use and benefit of a boy child, some six or seven months old, the son of Emiline Warren, the use and appropriation of said money to be left entirely to their discretion, whether to give at all or not, and as circumstances may justify; no part of the sum being given for the use of any of the child's connections, in the event of the death of the child; nor to the child, unless it can, in the opinion of my executors, be usefully appropriated. The residue will remain as among the effects of my estate, to be appropriated as hereinafter named."

The testator then gives to his sister, Sally C. Northrop, the sum of five thousand dollars, and requires it to be invested in land, as soon as his estate is so settled as that it can be invested, or in such security as she may prefer, the use and benefit of the same to go to her annually, but not to be in the control of her husband; the principal to be preserved untouched, unless such circumstances of want should occur as, in the minds of his executors, should make it necessary to give to her use a portion of the principal; but in the event no such circumstances do occur, the principal to be preserved and secured for the mutual use, at her decease, of the heirs of her body.

He also creates a charge upon his estate of one hundred dollars annually, to be paid by his executors, to his step-mother, Mary Atwood, the same to be paid to her so long as she lives. Testator further requires, that the eight thousand dollars above named as given to each of the slaves, (naming them) being in all fifty-six thousand dollars, be invested in lands in Indiana, Illinois or Michigan, which can be entered at Government price, taking care to make the best selections, until

one half of said legacies respectively is invested, and the other half to be loaned out on good security of individuals, always taking care to have it additionally secured by mortgage upon real estate; the interest to be payable annually, which shall also be loaned out on bond and mortgage in like manner.

It is also provided by the will, that all the testator's property be sold at public sale on a credit of one, two, three and four years, in equal payments; that his land and negroes be sold on a credit of one year, provided the same can be done without injury to his estate or growing crop; that as soon as the nine slaves before mentioned shall be removed to a free State and provided for as previously stipulated, and the money invested in lands and secured as above directed, the titles for the said land, as well as the bonds for the money, are to be delivered to them, to-wit: Candis, Seaborn and Mary, to use and control to all intents and purposes as their own, and independent of the appropriation for them, which he desires should be done as soon as can be.

He desires the appropriation for the removal and support of the slaves to be manumitted to be among the first to be made, and the children of Candis to be well supported and provided for, and educated, until the investments are made for them, as provided in the will, when that charge can be transferred to their proper guardians, to be appointed for them in the State to which they may be removed.

The residue of his estate, after paying off his debts and liabilities, is given to the children of Sally C. Northrop, his sister, resident in the State of New York: half to be invested in lands in some of the new States, contiguous to the lands to be entered for the seven mulatto children above named, and the remainder to be loaned out on bond and mortgage, &c.

The testator further provides, as follows: "I do hereby invest in my executors full and complete power to remove the said persons, and that the title and ownership in the said persons be full and complete for so removing them, knowing full well they cannot be given their freedom to remain in this State." After appointing his executors, and providing for filling vacancies, and providing compensation for them, as also making such children as should be born of his sister,

Sally C. Northrop, before the distribution of his estate, equal participants in the residuum, the testator again declares that, "the before-mentioned children, namely, Alexander, Ann, Cebille, Julius, John, William and Daniel, I charge upon my executors to have properly and faithfully schooled for the term they may remain in their charge, and if it becomes necessary for them to extinguish their charge, after four years, to make such arrangements as will secure to them a good English education."

Franklin K. Beck, one of the administrators with the will annexed, answers the bill, and admits the execution and probate of the will as charged, the death of the testator, the refusal of the executors to qualify, the appointment of himself and Sellers as administrators with the will annexed, their sale of the cotton crops and a portion of the slaves, the amount of the sales, the supposed amount of indebtedness; admits that the funds received, and which have not been paid out, are in his hands and the personal representative of his co-administrator; admits that there are some sixty or seventy land warrants in his hands, purchased from soldiers who served in the late war with Mexico; that powers of attorney, many of which are incomplete, authorizing said Atwood to do what was necessary to render certificates of discharge which he purchased from said soldiers available, are in his possession, but that they are, perhaps, unavailing, as Atwood did not execute the power before his death; and said administrator prays the direction of the court, as to whether they are to be considered real or personal estate. He admits that much of said Atwood's lands was purchased since the date of his will; also admits the provision in the will requires the executors to remove and emancipate the slaves named, quoting the clauses in the will which refer to this subject; admits the death of Cebille, but denies that the bequests in the will, creating a trust for the slaves after they shall have been removed to a free State, or the requisition upon his executors to remove them, are void; on the contrary, he insists upon their validity, and that they may be carried out without violating either the law or the policy of the State of Alabama; also admits that the complainants are the heirs at law, as charged, of said testator.

The other administrator, Sellers, having died since the institution of the suit, it was ordered, that as to him the same should abate.

Upon the final hearing upon bill and answer, and agreement of the parties consenting to certain amendments to the bill and answer, putting more directly in issue the legality of the legacies and the liability of the slaves attempted to be manumitted to be administered on as property of the estate, and of the land acquired by the testator since the date of his will to pass under the will to the residuary legatees, as contended for by the administrator, or to the heirs at law, as insisted in their behalf, the Chancellor pronounced a decree substantially as follows:

First, That the trusts created in favor of slaves who are in this State, are void; that they cannot be emancipated in the manner pointed out in the will, without the consent of the parties interested in the estate; that, being slaves, they must be treated as such; that the legacies to them being void, fall into the residuum, and are to be paid to the residuary legatees;

Second, That the legacies to Alexander and Ann, the negroes in the State of Ohio, are valid, said negroes being free;

Third, That the land warrants are to be regarded and treated as real estate, and do not pass under the will, but descend to the heirs at law;

Fourth, That, in like manner, the land acquired subsequently to the date of the will, does not pass under it, but descends to the heirs at law as though the testator had died intestate; and the administrator was directed to administer the estate accordingly.

Both the complainants and the defendants are dissatisfied with the decree, and assign errors in this court. The complainants in the court below here insist, that the Chancellor erred:

1. In deciding that Alexander and Ann, who are in the State of Ohio, are free;

2. In holding that the legacies of $8000 to each of them were valid;

3. In not decreeing upon the various trusts put in issue by the pleadings;

4. In decreeing upon points not put in issue by the pleadings.

On the other hand, the administrator assigns for error:

1. That the court decreed the legacies to the slaves in this State were void, and that the trusts of the will respecting them could not be carried out;

2. In holding that the land warrants should be treated as land, and that they descended to the heirs at law;

3. That the land acquired after the date of the will should descend in like manner.

Elmore & Yancey and A. P. Bagby, for plaintiffs in error:

I. If the will creates a trust in the executors to remove the negroes to another State and there free them, the trust is unlawful. It is not true, that an individual may do as he pleases with his property during life, and by will delegate to another the same right after his death. The right of disposition by the owner during life may be somewhat regarded as a natural right, incident to its acquisition and enjoyment; but this right is regulated by law. The right of disposition after death is the creature of society, and of law, and must be exercised conformably thereto. A man may burn up his property, or may sell it and cast the proceeds into the sea, but a will directing his executors to do these things would scarcely be held good and valid. Atwood might have sold all his estate, and taken the proceeds to New York, or any other free state, and there established a press for the printing and distribution among our slaves of incendiary publications to excite them to insurrection; but if he had bequeathed his estate to executors or trustees, for the purpose of such an establishment, our courts would certainly declare it void, as being against the policy of the State. The true question is, not to what extent this policy is contravened, but whether it is contravened at all.

It cannot be said, that the right to manumit slaves existed at common law; for slavery, as it exists here, was unknown to the common law. Villeins could be manumitted; but they had a *status*, possessed civil rights, and were free as to all the world but their lord. He had no property in them, but only

a right to their services, and these he could release by deed, or by certain other acts in his lifetime; but he could not release them by will, because, on his death, they descended at once to his heir along with the land. Villeins had a capacity to take, because they were persons, and not property.

Trusts are regarded in equity in the same manner as the title is at law, and must vest in some one capable of taking; and must be of such a nature that they can be enforced, and in favor of some one who can enforce them. And legacies, whether direct or in trust, must vest at the death of the testator; or they may take effect at a future day, if the time be fixed; otherwise, they are void for uncertainty. 3 Peters 467.

Although the trusts are to be consummated in a State where they are legal, yet the courts of the State where they are created, and where their execution is commenced, must, of necessity, when called on, pronounce on their validity; and where the laws or policy of that state are contravened in any respect, they must declare the trusts void. "The law will not permit itself to be overruled by any device, however cunning, nor by any circuity, however remote." If the trusts for the removal and manumission of these slaves are valid, they derive their validity from a will executed in this State, by a person domiciled here, in relation to property in this State, all of which, testator, will and property, are subject to our laws. If these slaves are entitled to their freedom under this will, the right is vested in them by the laws of this State. 1 Rand. 234; 6 ib. 563. Slaves, then, may be freed by will, not by a direct bequest to that effect, but by a naked trust to others to free them, or to remove them elsewhere and emancipate them. If this can be done by such a trust, it is difficult to see why it cannot be done directly, upon condition that they should leave this State in a certain time.

To sustain the validity of these trusts, the court must determine that our policy is in favor of manumission; or, that we have no policy at all on the subject, provided they are removed from the State. This question is settled by the case of Trotter v. Blocker, 6 Porter 269, where it is held, that the constitution and laws of this State declare a distinct policy, which is not only against the increase of free negroes, but against the emancipation of slaves. The reasoning of the

court in that case is fully sustained by the cases referred to in Virginia, North Carolina and South Carolina, Hinds v Brazeale, 2 Howard (Miss.) 837; Frazier v. Frazier, 2 Hill's So. Ca. 304; also, 7 Ala. 796; 9 ib. 475; 13 ib. 102.

The principles of the decision in the case of Ross & Ross v. Vertner, 5 Howard, (Miss.) 305, are not in conflict with those of Trotter v. Blocker.   The former can only be sustained, on the ground that the policy of Mississippi is in favor of emancipation, provided the slaves are sent out of the State; and this seems to be the controlling idea of Trotter, J., in that opinion.   He entirely overlooks the clause giving to the slaves an election whether they shall be sent off or remain, and which was held, in Carroll & Wife v. Brumby, 13 Ala. 102, to invalidate the bequest, because they could not elect. In the case of Frazier v. Frazier, in South Carolina, Judge Harper did not sit, and does not appear to have concurred in the opinion.   O'Neal, J., who delivered the opinion, is well understood in South Carolina to entertain peculiar opinions on this subject.   He rests his opinion on the same ground with Judge Trotter.   Since these decisions were made, a statute has been passed, both in Mississippi and South Carolina, to meet such cases, adopting the principles for which we contend, as laid down in Trotter v. Blocker.   These acts cannot be said to make the policy of those States; they are simply declaratory of it, being rendered necessary by the decisions of their courts.   1 Richardson's Eq. R. 61.

II. But we insist, that this is not the true construction of the will.   There is no pretence that the bequests of money to the slaves are valid, except as to the two already in Ohio. These legacies vest immediately on the testator's death; there is no future period fixed, at which the negroes are to take them.   The legacies, whether direct to the negroes, or to the executors in trust, are given, and, by the terms of the will, vest on the testator's death, or not at all.   If the intended beneficiaries take these legacies, they can only do so by virtue of a capacity conferred on them by the will, contemporaneously with the gift of the legacies, unless they previously had that capacity.   They were slaves at the testator's death, and the will cannot confer on them the capacity to take under it. If freedom was not given, or intended to be given, to take

39

effect at the testator's death, the legacies of money fail, because of the incapacity to take as slaves.

The two children in Ohio are in the same condition with the others, as to capacity. They have never been emancipated; the fact that they are in a free State, does not make them free by our laws. If brought back to this State before the testator's death, they would have been his slaves. The will speaks of them as slaves, and treats them as such. The testator expresses his desire to give them their freedom. He has never abandoned his control over them; Brown must be regarded as his agent. Originally slaves, and no act of manumission being shown in their favor, they continue slaves, and the legacies of money to them fail.

Every part of a will may be looked to, to ascertain the testator's intention. Transpositions may also be made; but omissions cannot be supplied, nor can passages having meaning be left out of consideration. When various persons are the beneficiaries of the will, and the bequests are of similar character, it will be held that the testator intended to bestow them all in the same manner, and at the same time, unless a contrary intention appears; and when one only of such bequests has certainty, as to time or manner, the others will be referred to it, to determine their qualities. In this case, all the bequests of money to the negroes were intended to be put on the same footing, and all the bequests of freedom on the same footing: all were to vest at the same time with each other. The will does not fix a period at which they are to vest; but the law says, that they vest at the death of the testator, or not at all; and as the legatees are incapable of taking at that time, both legacies fail. The clauses bequeathing freedom and money, standing alone, would make the bequest of freedom void, and such it must remain, unless controlled by some subsequent clause. The subsequent clauses which are relied on, as having this effect, invest the executors with the bondage, control and ownership of the slaves, "so far as it may be necessary to remove them to a free State; the testator "knowing full well, they cannot be given their freedom, to remain in this State."

Now, here is a trust which is said not to be against the law or policy of the State, and although the slaves could not en-

force it, yet the courts will leave it to the conscience of the trustees. A short answer to this is, all trusts are void which cannot be enforced, at the instance of the party in whose favor they are created; and as the executors are naked trustees, they hold for the next of kin. Moreover, if this is a trust, it is for a specified and limited purpose, viz: to remove them to a free State. Why did not the testator add, "and for the further purpose of emancipating them when removed?" The reason is obvious, from a reference to the preceding clauses; because he had already given them their freedom. It is the same as if the testator had said: "I hereby give them their freedom, and, that they may enjoy that gift, I charge upon my executors the duty of removing them to a free State; and to enable them to do so, I bequeath to them the ownership and control of said negroes, for that purpose and for that alone." This is further evident, from his making the expenses of their removal a charge upon his estate; which is a trust vesting in this State, for their benefit, at his death, if at all.

This construction of the will is sustained by the case of Trotter v. Blocker, *supra*. The only difference between the two bequests, is this: in that case, there was a direct bequest of freedom; in this, it is to trustees for the same purpose.

III. The land warrants were properly considered land, and descended to the heirs at law. They cannot be distinguished, in this respect, from bonds for title to land.

F. K. BECK, *contra, pro se:*

The owner of property has the absolute control and dominion over it, and this dominion he can relinquish at pleasure; the manner of relinquishment, in the absence of legal restraints, is left entirely to his discretion. The right to dispose of property by will, is co-extensive with the owner's right of disposal while living. 4 Wheaton's R., 35; 1 Freeman's Ch. R., 587; 2 Hill's Ch. R., 305. A slaveholder may, in virtue of his right of property, remove his slaves beyond the limits of this State, to any other quarter of the world, even though their emancipation be his avowed object; and this power he may transmit to his executor, by testamentary disposition, as amply and fully as he enjoyed it himself. Frazier v. Frazier, 2 Hill's Ch. R., 305; Ross &

Ross v. Vertner, 1 Freeman's Ch. R., 587; 5 Howard, (Miss.) 305; McCutcheon v. Marshall, 8 Peters, 285; 2 Call, 319; 5 ib., 311; Elder v. Elder, 4 Leigh's R., 252; 6 Sm. & Mar., 93; 7 ib., 663; 4 Georgia R., 445.

The question before the court is a question of removal, and not of emancipation. The will does not direct the executors to emancipate the slaves, but to remove them to a free State, that they may acquire freedom by the silent operation of the laws of that State. But if they thus become free, it is a matter with which the laws of Alabama have no concern. The laws of Alabama do not prohibit the right of emancipation; they only qualify the right, when about to be exercised within the State. Their object is, to prevent the increase of free negroes within the State. The policy of Alabama is opposed to the increase, rather than the decrease of her black population. The bequests, then, to trustees are good, being opposed to neither the policy nor the laws of this State; and the devises for the benefit of the slaves are also good, and will vest when the precedent condition, their removal to a free State, is performed. Then they acquire a capacity to take. 2 Hill's Ch. R., 317; 2 Call, 270, 298. A conditional devise of freedom to a slave is good, when there is a precedent valid trust raised to support it. Pleasants v. Pleasants, 2 Call, 319; Williams v. Ash, 1 Howard's U. S. R., 1. A testator may devise his property on what trust or condition he pleases, so that it be not against law. 5 Wheat., 35. In construing a will, the court will, if possible, give effect to the testator's intention; and for that purpose, will transpose words and even sentences. 2 Hill's Ch. R., 316. The evident intention of the testator, Atwood, was, to give these slaves, and the legacies intended for them, to his executors, in trust that they might remove the slaves to a free State, where they might become free and capable of taking their legacies. Their removal was a condition precedent to the vesting of the legacies. As to their capacity so to take, see 6 Sm. & Mar., 93; 7 ib., 663; 1 Howard's U. S. R., 1; 1 Richardson, 80.

The two legatees who were in Ohio at the time of making the will, and have been there ever since, are free, and of course entitled to their legacies. Slavery exists only by virtue of the laws of the States where it is sanctioned. If a

slave escapes to a free State, he is free, according to the principles of the common law; and his re-caption is authorized only by the constitution and laws of Congress. 2 McLean's R., 596. If the owner of a slave voluntarily takes him to a free State, the slave becomes free, and the owner cannot restrain him of his liberty, whilst there, nor carry him away without his consent. 1 Wash. C. C. R., 499; 12 Conn., 38; 18 Pick., 193; 10 B. Monroe, 545; 2 Marsh., 467; 3 Monroe, 270; 4 Mis., 592; 3 McLean, 350; 9 Gill & J., 19. In the case at bar, the testator, previous to 1843, took these two persons to Ohio, and left them there for about ten years, with the avowed object, as declared in his will, of giving them their freedom.

CHILTON, C. J.—The prominent questions presented by the record before us, as brought to view by the cross assignments of error, may be thus stated:

1. Are the provisions in the will of Henry S. Atwood, which vest the bondage, title and ownership of the slaves therein named in his executors, for the purpose of their being taken to a free State so as to remain free, and directing certain sums to be invested in lands, and other sums to be loaned out, for their benefit, valid bequests according to the laws and policy of this State?

2. Are the legacies to the two negroes residing in the State of Ohio, Alexander and Ann, legal and valid?

3. Are the land warrants owned by the testator to be regarded as real or personal estate in a court of equity?

4. Do the lands acquired by the testator between the date of his will and the period of his death pass under the will, or go to the heirs at law?

The counsel have confined their argument to the two inquiries first propounded, and as they alone involve any diffi culty, we propose making them the chief subject matter of discussion in this opinion.

The objections to the validity of the trusts created by the will in favor of the negroes, may be thus stated: 1. That the bequests are in violation of the laws of this State; 2. That they are opposed to its settled policy as declared by several adjudications of this court; 3. That they are illegal and

void, because the legacies do not vest upon the death of the testator, nor at any fixed future period; and 4. Because the court cannot execute the trusts, and the executors holding by a trust which cannot be enforced, it is insisted, should be considered as holding in trust for the next of kin of the testator.

The first, and main inquiry is, are the bequests in violation of any law of the land? It is argued, in opposition to them, that the right which a master has to manumit his slaves must be conferred by statute, or it does not exist, inasmuch as the institution of slavery, as it obtains with us, was unknown at the common law, and, as a consequence, the right of manumission, or of enfranchizing them, was unknown.

It has generally been conceded (and I have several times admitted it) that slavery, as it here exists, was unknown to the common law; but upon an examination of the subject, I am strongly inclined to think there was a time in England, when negroes, or heathens and infidels, were regarded as the subjects of property. This may be fairly inferred from British diplomacy and British legislation, as well as from elementary writers and several adjudications. In proof of this, I need only refer to the treaty of Assiento, concluded on the 26th of March, 1713, between the kingdoms of Spain and Great Britain, whereby the latter secured to the British South Sea Company the privilege of furnishing 4,800 slaves to the Spanish colonies in America, annually, for thirty years; to the statute of 5 Geo. II, c. 7, § 4, which declares that negro slaves in America shall be liable to all simple contract debts as well as specialties; to the 32nd Geo. II, c. 31, in the preamble to which it is recited, that the trade to Africa is advantageous to Great Britain, and necessary in supplying its colonies with negro slaves. According to Swinburn, p. 84, 6th Ed., there was a species of slavery in England distinct from villenage; and the author of the Mirror intimates that it was lawful to hold infidel slaves. Mir. c. 2, § 28. Mr. Justice Blackstone (though not altogether consistent with previous declarations of his own) says: "Whatever service the heathen negro owed to his American master by general, not by local law, the same (whatever it may be) is he bound to render when brought to England and made a christian." He also

says: "With regard to any right which the master may have lawfully acquired to the perpetual service of John or Thomas, this will remain exactly in the same state as before; for this is no more than the same state of subjection for life which every apprentice submits to for the space of seven years, or sometimes for a longer time." 1 Bl. Com. 423.

In Butts v. Penny, 2 Lev. 201, decided in 29th Chas. II, and which was an action of trover for 200 slaves, (or as another report states, for 10 slaves, 20 Str. 51,) the jury found a special verdict, namely: that the negroes were infidels, subject to an infidel prince, and usually bought and sold in India as merchandize, by the custom amongst merchants, and that the plaintiff had bought them and was in the possession of them, and that the defendant took them out of his possession. The court held, that negroes being usually bought and sold amongst merchants in India, and being infidels, there might be a property in them sufficient to maintain the action. Judgment *nisi* was accordingly rendered for the plaintiff, and on the prayer of the defendant's counsel to be further heard, leave was granted until the next term. It does not appear what was finally done in the case.

But in Gelly v. Cleve, decided by the Common Pleas in the 5th of Will. & Mary, and reported in 1 Ld. Raymond's Rep. p. 147, it was adjudged "that trover would lie for a negro boy, for they were heathens; and therefore a man may have property in them, and that the court without averment made, would take notice that they were heathens."

So also, in the singular case of Sir Thomas Grantham, reported in 3 Modern Rep. 120, Sir Thomas, as the report goes, "bought a monster in the Indies, which was a man of that country, which had the perfect shape of a child growing out of his breast as an excrescency, all but the head, and brought him to England and exposed him to the sight of the people for profit. The Indian turned christian and was baptized, and was detained from his master, who brought *homine replegiando* for his recovery. The sheriff returned that he had replevied the body, but did not say the body in which Sir Thomas claimed a property; whereupon the sheriff was ordered to amend his return," &c.

Indeed, it was not until the decision of the case of James

Somersett in 1771–2 by the King's Bench, which called forth the great argument of Mr. Hargrave, that this question appears to have been fully settled in England, at which time, the policy of England in respect to slavery and the slave trade, as well as to villenage, had undergone a change. See 20 State Trials, London Ed. pp. 1 to 81.

Without, however, going further into the old cases, those which I have cited may suffice to show, that it is at least very questionable whether at one period slavery, as it exists among us, was not recognized by the common law. But be this as it may, it is most unquestionably true, that slaves are now regarded by our law as chattels, and the owners thereof have an absolute unqualified property in them; and although such right might not have been recognized by the ancient common law, yet such is the genius and expansive nature of the common law, that it adapts itself to the necessities and exigencies of society, and when a new species of property is introduced, and the statute law is silent as to the rules by which it is to be governed, the common law embraces it, and its rules are applied to it, modified, of course, according to the nature of the property thus subjected to its governance. Navigation and transportation by steam were unknown to our common law ancestors; but no one will contend that, for this reason, the rules of the common law, which are adapted and suited to the nature of such improvements, do not apply. On the contrary, we have daily recurrence to the principles of the common law, to guide us in defining the rights and prescribing the duties of persons in reference to new inventions and improvements, which would otherwise be left to the arbitrary discretion of the judge.

The master, having an unqualified property in his slaves, may dispose of them in any way he pleases, unless restrained by some rule of law, or fixed and settled policy of the State. The *jus disponendi*, or right of disposing of his property, is an inseparable incident to its absolute and unqualified ownership. This general power which the master has over the slave, both in respect to his treatment and manumission, has been controlled and guarded by legislative checks, prompted alike by humanity for the slave and security for the State. In considering the rules which apply to, and regulate this pe-

culiar species of property, we must look upon them in the double capacity of chattels and intelligent beings. Considered in this latter capacity, our law, pervaded as it is by the spirit of christianity, and founded on principles of humanity and benevolence, throws around them its protection. This protection is not only secured by the fundamental law, the Constitution of the State, (Art. vi. §§ 2 and 3,) but many statutes have been enacted to secure the same end. The law punishes an assault or battery upon them by any third person, Digest, 545, § 41; prohibits the master, or any one by his permission or authority, from inflicting cruel or unusual punishment upon them, (ib. 431, § 1); secures to them, in trials for offences above petit larceny, the right of trial by jury, (ib. 474, § 18), and provides them counsel in certain cases at the public expense, (ib. 473, § 13); and the master is bound both morally and legally to supply the slave's necessary wants, and he may not avoid this liability by voluntarily putting the slave away from him, without providing some one to occupy the relation of master to him. 4 Ala. 66. Subject to these, and other restrictions which we shall presently notice, the right of the master to his slaves is the same with his right to any other chattel. He may sell and dispose of them without writing; may convey, or bequeath them by his last will and testament, absolutely or in trust, precisely as other personal property; and but for the inhibition created by the statute laws, he might at pleasure renounce his property in them by manumission. If the written law was silent upon the right of emancipation, and no consideration of public policy was fairly deducible from it, what law would forbid the exercise of this right? Certainly not the common law; for the counsel yield this, when they contend that the institution was unknown to that law; but if it were recognized by it, the same right which the lord had to enfranchize his villein would doubtless be awarded the master in respect of his slave. This right, by the ancient English law, the lord exercised at pleasure, by delivering the villein to the sheriff and publicly proclaiming him exempt from the bond of servitude by manumission; then showing him open gates and ways, and delivering him a lance and a sword, he became a free man, Crabb's His. of Eng. Law, 82;

but after writing became common, they were manumitted or enfranchized by deed.

But, if it is said the institution of slavery, as it exists here, is more analogous to that which obtained among the Romans, and that we should seek for analogies in the civil law, we reply, that the master, according to that law, could liberate his slaves at pleasure. Justinian's Inst. Tit. *Quibus modis manumittatur*, § 1.

In McCutchen et al. v. Marshall et al., 8 Peter's Rep. 220, it was said with respect to the right of the owners of slaves to emancipate them: "As a general proposition, it would seem a little extraordinary to contend, that the owner of property is not at liberty to renounce his right to it, either absolutely or in any modified manner he may think proper. As between the owner and his slave, it would require the most explicit prohibition by law to restrain this right." It was said, that "considerations of policy, with respect to this species of property, may justify legislative regulation as to the guards and checks under which such manumission shall take place, especially so as to provide against the public's becoming chargeable for the maintenance of slaves so manumitted." See, also, Furguson et al. v. Sarah, 4 J. J. Marshall's Rep. 103, and cases collated in Wheeler's Law of Slavery, pp. 279 to 388.

We are, therefore, of opinion, that as between the master and his slave, aside from all statutory prohibition, the right of manumission does exist, and is deducible not only from the absolute ownership of the master in the slave as a chattel, but from analogous rules applicable to slavery as it has obtained in every civilized country, as far as our researches extend, and as sustained by numerous adjudications of our own country.

Let us next turn to the laws of our State, and see how far this right has been restricted.

The first act passed upon the subject, was in 1805, by the legislative council of the Mississippi Territory, entitled "An act to prevent the liberation of slaves only in cases hereinafter named, and for other purposes." The act provides, that from and after its passage, "it shall not be lawful for any person or persons, holding or owning slaves, to liberate them,

or any of them, unless they first prove. to the satisfaction of the General Assembly, that such slave or slaves have done some meritorious act, either for the benefit of said owner, or for the benefit of this Territory;" and provides, that in such case the owner enter into bond and security against such slaves' becoming a charge upon the Territory; and provided, also, that such slaves should be liable to the existing debts of the party emancipating them. Nothing was said in this act respecting their removal without the limits of the Territory.

Thus the law, in respect to emancipation, stood for many years. Divers applications were made under it to the legislature, by the owners of slaves, for their emancipation. At first, they were granted without inserting their removal from the State as a condition, but the increase of free negroes doubtless suggested this provision as necessary, and we find it was generally added after the Constitution was adopted. From February, 1818, until December, 1822, there were some fifty slaves liberated by the legislative authority; and these frequent applications becoming inconvenient, it was deemed proper to vest the power in the judge of the County Court, which was done by statute in 1834.

By the sixth article of the State Constitution, title "Slaves," § 1, it is declared, that "the legislature shall have power to permit the owner of slaves to emancipate them, saving the rights of creditors, and preventing them from becoming a public charge."

By the act of 1834, it is declared, that "whenever the owner or owners of any slave or slaves, shall be desirous of emancipating such slave or slaves, such owner or owners shall make publication in some newspaper printed in the county where such slave or slaves reside, (or, if there be no paper printed in said county, then in the nearest paper thereto,) for at least sixty days previous to the making of the application; in which shall be set forth the time and place that such application will be made, together with the names and description of the slave or slaves sought to be emancipated; and at the time appointed, the judge of the said County Court may, upon petition filed, proceed to hear and determine upon the application so made; and if, in his opinion, said slaves should be emancipated, in consideration of long, faithful and meri-

torious services performed, or for other good and sufficient cause shown, said judge may proceed to emancipate and set free such slave or slaves; and the clerk of the said court shall make record of the same in a book to be kept for that purpose: *Provided*, That such slave or slaves shall remove without the limits of this State within twelve months after such emancipation, never more to return, and that such emancipation shall not take effect until after such removal." Clay's Dig. 545, § 37.

The constitutional provision, as well as the acts above referred to, may be regarded, (and indeed it has been so decided,) as a prohibition against the emancipation of slaves in this State, except in the mode pointed out. This question came before this court in the case of Trotter, Adm'r, v. Blocker and wife et al. 6 Por. 269, which was a bill filed by the administrator *cum testamento annexo* of William Butler, deceased, asking directions in reference to certain trusts created by the will. The bequest of freedom to certain slaves was as follows: "It is my will and desire, after my death, that all and every one of my negro slaves be free and emancipated, they and their heirs, forever. I give and bequeath unto my said negroes all my plantation utensils and my kitchen furniture, and give them one year's clothing and one year's provision out of my estate; and should the laws of my State be such, that the said negroes cannot remain in the limits of the State free, I give and bequeath the sum of one hundred dollars to the said negroes, to remove them to some other State in the Union." And the court very properly held, that the bequest of freedom to the slaves was void, as it was to take effect in this State, and the slaves were made the legatees of their own freedom, and as slaves, they were incapable of taking. The marked difference between the bequest above copied and those under consideration in the will of Atwood, is this: In Butler's will, the slaves were declared free in this State, and provision was made, if they could not remain in this State in that condition, for their removal; while, in the will before us, the slaves are to continue such in this State, and the executors are their owners, but for the purpose of taking them to a free State, where they may enjoy their freedom. In the case of Butler's will, the bequest of freedom to

the slaves was void, because the *cestuis que trust* were incapable of taking, and being void, the rights of the next of kin immediately attached upon the death of the testator; but in this case, an executory trust is created by the will, not to vest in slaves, but in free persons—not to vest in this State and work the freedom of the slaves here, but to vest in them after they shall have been removed. The question, then, resolves itself into this : May the personal representative of the testator, in obedience to his last will, remove the slaves to another State by the laws of which they become free ? It is conceded that the testator might lawfully have done this, and in our opinion, this concedes the whole case ; for if the policy of the law be opposed to every form of emancipation, and no slave can be emancipated but according to the mode pointed out, and it be true that this will is but a device to avoid the statute, by effecting the emancipation of the slaves through their removal to a free State, it would seem to follow, that if the testator, instead of appointing another to execute his will, had himself effected his desire while living, by a removal of these slaves, and the investment of moneys for them, he would have been guilty of a violation of the laws of the State. It cannot for a moment be questioned, but that Atwood, while living, could have made the same disposition of his property which he directs his executors to make. He might have removed the slaves in person, or by his agent, and there is no law forbidding it. Who is the executor ? He is but the representative of the testator, and is influenced by his will to do what he desires, if such desires be lawful: the means of rendering the testator's will effectual. The testator, as respects the execution of his lawful desires as to the disposition of his property, and which he has expressed in due form, still lives in the executor in legal contemplation. Powell on Devises, 150.

In Alston v. Coleman, 7 Ala. 795, the testator bequeathed a slave to his wife for life, and at the death of his wife, said slave to be set free; and he gave to the use of said slave $1500, to be used subject to the discretion of his executors. The court were first inclined to the opinion, that the bequest was good, and fell within the principle of the decision of Pleasants v. Pleasants, 2 Call 270, which was a bequest to liberate the slaves in future and at a given period, provided the laws of

the State should at that time allow them to be freed. But, as the will did not refer the bequest of freedom to a future time, so as to take effect or be defeated, according as the law might then warrant or forbid it, the court was of opinion that it must be construed with reference to the laws of the State existing at the time of the testator's death, and by this law the bequest of freedom being void, the trust dependent on it fell to the ground. The argument of the learned judge who delivered the opinion in this case, and the reference made, with apparent approval, to the case of Pleasants v. Pleasants, is quite persuasive to show that the court was of the opinion, that, notwithstanding there was no person at the death of the testator capable of taking the bequest, yet, if it was given to take effect at a future period, when the party for whose benefit it was created might be capable of taking, the trust would be supported.

The trust in the will before us, as we shall hereafter endeavor to show, is not for the manumission of the slaves in this State. The testator was apprised that this could not be done; but, being desirous of giving the slaves their freedom and making provision for them, he wills them to the executors, to be taken where they may enjoy freedom as well as the provision made for them. Such was unquestionably his intention.

The case of Carroll and wife v. Brumby, 12 Ala. 102, merely decides, that when the removal of slaves to a place where they may enjoy their freedom depends upon their election, the bequest is void for want of their capacity to elect.

It is very clear that none of the decisions of this court come up to the question now involved, and the statute law refers merely to the emancipation in this State. There is nothing said, either in the Constitution, statutes or decisions of Alabama, about the power of the owner to remove his slaves to a non-slaveholding State, either by himself, his agent or his personal representative; nor any attempt to forestall emancipation by such means.

But it is argued that these bequests are opposed to the settled policy of this State. Now we have seen, in the language of the Chief Justice (Collier) in Trotter v. Blocker, 6 Por., 292, that "independent of legislative grant of power,

it was permissible at common law for the master to set at liberty his slaves." This he might have done in this State, the statutes which prohibit him aside. Much more then might he have sent them out of the State, to be manumitted under a foreign jurisdiction; and we are called upon to restrain, or rather to deprive, the master, or which is the same thing, his personal representative, acting in accordance with his declared will, of this clear common law right. We can only ascertain the policy of the State from the laws which have been enacted by the legislature, or set forth in the Constitution; for, were we to go outside of these for a rule of decision, and look to the conflicting views of politicians, as to what line of policy is most prudent to be pursued by the State; or disregarding these, should ourselves determine that it is wise and politic, as tending to guard the institution of slavery, that no slaves should be permitted to be taken from the State for the purpose of emancipation, we should manifestly assume the functions of legislators, and not judges. The legislative authority has said, that slaves in this State shall continue such while they remain here, unless for good cause shown to the Probate judge, upon the petition of the master, after due publication made, they are set at liberty by the decree of such judge, and then on condition of their removal without the State in twelve months; but the right of the owner to take or send them off as slaves so long as they remain in this state, but for the purpose of emancipation in a State where, by the law, this may be effected, has not been prohibited. Can this court superadd this inhibition? However much we might desire the law to be different, however much we might suppose sound policy requires that a restraint should be imposed upon this natural right of causing one's property to be removed to another State where it may be dealt with injuriously to our institutions, still, it is not for us to change or make the law. Our solemn duty is to administer it as we find it. It is not for the court, but for the legislature, to determine whether there is too great a disproportion between the white and slave population of Alabama, or what number of slaves would best contribute to the security of the institution, and to the development of the wealth and agricultural resources of the State. If, influenced by our views as to what is the policy of this

State with respect to manumission in another State, we should hold that the personal representative of Atwood shall not take the slaves mentioned out of this State, because it would to this extent lessen the number of slaves, and, consequently, the wealth of Alabama, and would be adding to the free negro population of some sister State persons who may contribute to incite our slaves to insubordination or insurrection, upon the same principle we must hold every bequest of a slave to a person residing in a free State void, because, if the executor delivers the slave to the legatee in such State, it works his manumission. Indeed, it is difficult to calculate the results to which such a principle of decision might lead. In this case, the distributees all reside in non-slaveholding States; so of the residuary legatee. Now, although we might hold the will void so far as it directs the removal of the slaves, because its effect would be to emancipate them; it is clear the same result might follow, unless we could also say, that the parties entitled, under the will, to them, should not remove them to their places of residence; for if they should do so, emancipation would follow. But is any such power vested in the court? Could we declare a bequest of slaves to one whose known feelings upon the subject would prompt him to remove and thus to emancipate the slave, void, as an evasion of the statute against emancipation? Or can the court hold that, because an abolitionist is next of kin to the slaveholding intestate, the law of succession in such case must yield to the policy of the State against emancipation? Most certainly not. We must not suppose the legislature of the State unapprised of the condition of the institution, and the history of emancipation by removal of slaves, which has frequently been effected for years past. And it is altogether reasonable to infer that, had such removal been opposed to the policy of the State, laws would have been passed prohibiting it. How far the legislature may go in imposing restrictions on the power of transporting slaves from this to a free State, is not a question now before us, and of course we express no opinion concerning it.

There have been several adjudicated cases referred to by the counsel for the bequests, to be found in the reports of our sister States, fully sustaining the validity of the trusts created

by this will.  The case of Pleasants v. Pleasants, 2 Call's R.,
270, decided by the Court of Appeals of Virginia in 1799,
has already been incidentally referred to, but deserves a more
particular notice.  At the time of the execution of the will of
John Pleasants, which was under consideration in that case, it
was not lawful to emancipate slaves in that State, but the tes-
tator being desirous of freeing his slaves, and supposing doubt-
less that the law would be changed, inserted in his will a
provision, that whenever the laws of the country should ad-
mit of it, he desired all the slaves of which he was possessed
to be immediately free upon their arriving at the ages of
thirty years, together with their increase, subject to certain
discretionary powers vested in his executors.  A law was
afterwards enacted in Virginia, authorizing emancipation;
and the son and heir of the testator brought the bill against
the persons to whom the slaves had, in the meantime, been
bequeathed, to have them delivered up to him, and to have
the aid of the court in directing the mode of emancipating
them, &c.  The Chancellor held the bequest valid, notwith-
standing when the trusts were created the statute forbid
emancipation, except for meritorious services to be judged of
by the executive; and the Court of Appeals affirmed that
view of the decree.  They were considered executory be-
quests to vest upon a future contingency, and to be rendered
effectual when the trustees might lawfully execute the trust.
See also Elder v. Elder's Executors, 4 Leigh's Rep., 252.
The case of Fisher's negroes against Dobbs et al., 6 Yerg.,
119, goes strongly to support the bequests in this.  It ap-
pears in that case, that before any provision was made by the
statute law of Tennessee for the emancipation of slaves by
will, Peter Fisher, in July, 1827, made his will, containing
a provision that all his slaves should be free.  The act then
in force, authorizing emancipation, required that it should be
effected by petition to the County Court or Chancellor, " and
if the court, upon examining the reasons and motives set
forth in the petition of the owner, should be of opinion that
acceding to the same would be consistent with the interest
and policy of the State," then the court was authorized to
sanction such emancipation.  Some two years after the mak-
ing of this will, the legislature of Tennessee passed an act,

providing " that where any person shall, by his last will and testament, have directed any slave or slaves to be set free, it shall be the duty of the executors or administrators with the will annexed, to petition the County Court accordingly;" and it further provided, that if they fail or refuse so to petition, the slaves by their next friend may do so, and if the Chancellor is of opinion they ought to be set free, he may so order, requiring bond to indemnify the county as provided by the previous laws.

After the passage of the last named act, the slaves by their next friend filed their bill; but while it was pending, in 1831, the legislature passed an act to explain what they meant by the act of 1829, and in which it was declared, that said last named statute should in no wise be construed to extend to wills which were executed before the passage of said act, and requiring that all suits instituted under said act upon wills made before its passage, should be stricken from the docket, and the papers were ordered to be transmitted to the clerk of the County Court. The court held, that the bequest was valid; that the bill was well filed, and that the subsequent act was unconstitutional, as an unwarrantable interference by the Legislature with the duties devolved by the Constitution on the Judiciary.

Catron, C. J., said: " By the common law, the owner of a slave might manumit him at pleasure. The acts of 1777 and 1801 prohibited this, unless the Government consented to the contract of manumission. To give this assent, the County Courts were vested with authority. A deed or will of manumission is not valid, but binds the owner or represesentative of the testator, as between him and the slave. Before the act of 1829, the master or his representative was to do the first act; namely, petition the court for the Government's assent. The slaves had no power to cause their rights to be enforced in the courts of justice." He then refers to the subsequent act, giving them this power, and says that before its passage the negroes took a right, a common law right, binding on the executors as trustees, but their remedy rested with the executors. He might petition the County Court or not, at his pleasure. If he did, the distributees of Fisher could not complain; citing 2 Yerg., 563. Here, then, was a trust which the trustees

might lawfully have carried out. Yet, when it was created, there were no means provided for its enforcement. The case of Elder v. Elder's Ex'r., *supra*, furnishes a strong example of an executory trust of freedom, dependent upon removal to a free State, and which removal (to Liberia) was there said not to be contrary to any policy of the law. Per Tucker, President, 4 Leigh, 261.

In the case of James Frazier *et al.* v. The Executors of John Frazier, deceased, reported in 2 Hill's Ch. R., 304, the testator, by his will, after giving directions as to the disposition of his personal estate and the hiring of his slaves, and making provision for his wife, declared—" And after the decease of my wife, Nancy Frazier, it is my will and desire that the whole of my negroes be set free by my executors, and the amount of money arising from their hire, be equally divided among said negroes; and if the hire does not amount to one hundred dollars each, it shall be made up to them out of the other part of my estate before mentioned; the interest of the money is to enable them, with the assistance of the Government, to go to Domingo to be colonized, or to any part that they with Government may choose."

The bill was filed by the next of kin of the testator, claiming, amongst other things, the negroes and an account of their hire, on the ground that the provisions of the will for their freedom, &c., were void, as being contrary to the policy of the laws of the State of South Carolina. And the Chancellor (Desaussure) who tried the cause in the primary court, was of the opinion that the statute of that State against emancipation, and which declared that " no slave shall hereafter be emancipated but by act of the legislature," rendered the bequests relating to the slaves absolutely void, and so decreed. Upon appeal, and after able argument, the Court of Appeals held the trusts valid; and O'Neal, J., in delivering the opinion, said : " As a general rule, to which there is no exception, unless it be by express statutory provisions, it may be laid down, that the owner of property may direct his executor to dispose of it in any way which he could." He maintained that, while the act prevented emancipation within the State, it did not deprive the executor of the power of doing what the testator might have done; and as it was clear the testator might have

removed the slaves in his life time to a free State, and have thus emancipated them, it followed that his executor could be empowered by him to do the same thing.

Perhaps the principle thus broadly laid down by the learned Judge, could not be maintained as of universal application; nevertheless, we esteem it a general rule, and fully recognize its application to the case before us.

It was argued in the case last referred to, as in this, that there was no means of enforcing the trust, and that it was consequently void. Upon that point the court say: "It is said, how can the court compel the executors to carry such a trust into execution? For the slaves themselves cannot, nor can any other person, for them, file a bill to compel the executors to execute a will in this respect. But I apprehend there is in this case, and others like it, no difficulty. For on a bill filed by the heirs to partition the slaves, the court, if on looking into the will they should find the executors could execute it, by sending the slaves out of the State and there setting them free, would order them so to discharge the trust reposed in them by the testator. In other cases, the executors' oath to execute the will, and the fair claim which they have to the confidence of the court by the confidence reposed in them by the testator, are sufficient guaranties that such a bequest will be faithfully executed." And the slaves in that case were ordered to be forthwith removed by the executors beyond the limits of South Carolina, to some place where it would be lawful to emancipate them, and to be there emancipated, and the provision for such removal was held to be valid. The question, as it is substantially presented before us, has undergone a most thorough and elaborate investigation and discussion in an adjoining State, Mississippi, whose laws upon the subject of emancipation at the time the controversy arose, were not essentially different from our own, save that the legislature, instead of the court, was to judge of the meritorious cause for the emancipation.

In Ross & Ross v. Duncan et al., and the same v. Vertner et al., 1 Freeman's Ch. Rep., 587, it was held, that a trust created by will for the removal of slaves to Liberia or elsewhere, there to remain free, was not invalid; also, that a trust may be created, which may be perfectly consistent with

the law, and yet the law may have pointed out no mode of enforcement; still, it would not interpose to prevent its enforcement, but would leave its execution to the voluntary action of the trustee, and the doctrine, as asserted by Judge O'Neal in Frazier v. Frazier *supra*, was affirmed, that "the right to dispose of property by will is as broad and comprehensive as the right of disposition by the testator while living."

The same case afterwards came before the High Court of Errors and Appeals of that State, by appeal from the decree of the Chancellor, (see 5 How. Rep., 305,) and after very able argument by learned counsel, that court affirmed the decree, holding that it was not against the policy of the State of Mississippi for the owner of slaves to send them out of the State for purposes of manumission, and that a will requiring the executors to send the testator's slaves to Liberia, there to remain free, created a valid trust.

The question again came up in a recent case (1846) before the same court, Wade et al. v. The American Colonization Society, 7 Smedes & Marshall's Rep., 663, and the doctrine as previously asserted, was re-affirmed; and it was held, that the Court of Chancery might well entertain a bill at the instance of the trustee who was charged with the duty of removing the slaves, so as to enable him to execute the trust; that the slaves, by the will requiring their removal, acquired an inchoate right to freedom, which became perfect upon their removal, and that consequently the trusts were not void for want of capacity in them to take. It was, however, stated as a *quere*, whether, if the testator had required his slaves to be sent to Africa, and had appointed no trustee to take them, the slaves would have possessed any remedy to enforce the trust.

In Leech v. Cooley, 6 Sm. & Mar., 93, the testator by his will directed "his slaves to be set free and sent to Indiana or Liberia, as they might prefer," and directed a sale of certain other property, and part of the proceeds to be paid to the slaves thus liberated.

It was held, that the bequests were valid; that the executor might proceed in their execution; that the bequests to the slaves were not void for want of capacity in them to take;

that if they complied with the terms of the will, then the legacy was valid; otherwise, void. It was further held to be the policy of the State of Mississippi to prevent free persons of color from remaining in it, and that such policy did not conflict with the provision in the Federal Constitution which declares "that the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States," as no person of color could become a citizen within the meaning of this clause.

In the State of Georgia, where emancipation within the State is forbidden, it was recently held by the Supreme Court in the case of Vance v. Crawford, 4 Georgia Rep., 445, that it was not against the policy of that State for the owner to remove his slaves out of it for the purpose of manumission, and that having this power, he could direct it to be done by will; and a bequest to executors for the purpose of manumission by removal, and directions to pay certain sums to the freed persons, were held valid. To these other authorities might be added; but if any point may be considered as settled by the consistent decisions of our sister States, the cases above cited establish the proposition that, unless restrained by positive enactment, a testator may, by his will, effect the manumission of his slaves, by vesting the title to them in trustees for the purpose of their removal to a free State, there to enjoy their freedom.

It is, however, contended by the learned counsel, that it was the testator's intention to free his slaves in this State, and the direction to remove them was given merely to enable them to remain in that condition. It is true, the will is inartificially worded, and the construction contended for would appear correct when applied to isolated clauses of it. But it is our duty to arrive at the intention of the testator to be gathered from the whole will, and to give effect to that intention if lawful. Looking to the whole instrument, it is impossible, we think, to mistake the intention. It is clear that the testator was fully apprised of the impracticability of liberating his slaves, so as to entitle them to freedom in this State. This is shown by the fact, that he vests their bondage, title and ownership in his executors for the purpose of their removal to, and permanent settlement in a free State, no more to be

removed into a slave State, the declared object being to enable them to enjoy their freedom. He makes provision for their removal, and for their *status* as slaves to continue until they shall be removed, "knowing full well," to use his own language, "they cannot be given their freedom to remain in this State." The intention also with respect to the legacies we think is clear. The executors were to invest the money bequeathed for the benefit of these slaves in lands, in some one of the States of Indiana, Illinois or Michigan, in part, and the balance to be loaned on interest, which interest is to be paid annually and reloaned; and the titles to the lands and bonds for the money are not to be delivered to them, until after they are removed to a free State and provided for as is required by the will. Here is a future period fixed by the will, when they are to come into the possession of these legacies; a period at which they shall have acquired the capacity to take. Until then, the executors hold the funds, as they do the bondage and title to the slaves, in trust, upon a use to spring up or attach upon the condition of removal, when the intended beneficiaries shall be capable of taking. Words *in praesenti* will be taken in a future sense in order to serve the manifest intent. 1 Powell on Dev., 263–4.

Nor is it any valid objection to the validity of the trusts, that no mode has been provided for the enforcement of their execution. Many trusts and conditional bequests may be valid, and yet not capable of being enforced by judicial tribunals. Property may be granted on any condition which is not against the law; as "an estate, upon condition that the grantee shall go to Rome, and for breach of that condition, the heir may enter, but there are no means of compelling a journey to Rome." 1 Co. 22 b; 4 Wheat. 35. So, also, in cases where there is a condition precedent to a gift of a legacy, or some act required to be performed by the trustee, and the performance of the act or condition is discretionary with the trustee, there the interest does not vest, until the precedent act or condition is performed; but although the court will not compel the performance of a purely discretionary power, yet when performed the estate or interest vests. Hill on Trustees, 490, and authorities cited in note o.

Conceding in this case, that there is no one who could com-

pel the executor, or the administrator with the will annexed, to carry this trust into execution, and that he must be left to his own conscience, and to the obligation imposed by his official oath, yet, as we have seen that the trusts are not illegal, and the removal may lawfully be made by the representative of the deceased, it is clear the court will not interfere to prevent the trustee from complying with and carrying out the lawful desire of the testator. Whether it is such a trust as the court may compel the execution of, against the will of the trustee, is not now presented before us; it is sufficient that the trustee is willing and proposes to carry it into execution. It is he who interposes these trusts and asserts their validity; and it remains only for the court to direct him to do what, by his answer, he avers his willingness to perform.

The rule, that a court of equity subjects trust estates to the same rules to which a court of law does the legal title, does not affect the validity of these trusts, since it is well settled, that future contingent interests may be limited by will, if they be not too remote, to spring up and attach upon the happening of some subsequent event. And in respect to personal property, it is said, that no intermediate estate is required to support such future contingent interest; but an interest created by executory bequest will be valid, in the absence of such intermediate estate. Williams on Personal Property, 194.

As to the argument that the States whose courts have decided according to the view we have taken of this will, have, by statute, subsequently forbidden the manumission of slaves by directions in wills for their removal to free States, we have only to say, it proves that those States deemed an amendment to the law necessary; but until it is so amended, it is the duty of the courts to give it effect.

2. It follows, from what we have already said, that the legacies to Alexander and Ann, who have been residing in the State of Ohio for many years, are valid. These negroes have not escaped from labor or service, but have been placed in Ohio that they might enjoy their freedom, as is evident from the tenor of the will of their late owner, according to which, they are never more to be taken to a slave State. They must, therefore, be regarded as free persons of color

residing in the State of Ohio, and as such, are capable of taking. See Tannis v. St. Cyre, at present term; Josephine v. Pantney, 1 La. Ann. Rep. 329; Davis v. Tingle, 8 B. Monroe, 539; see, also, cases cited on the brief.

3. The land warrants, authorizing the selection and location of certain amounts of land out of the unappropriated lands belonging to the Government of the United States, must be regarded as land, and pass to the heir at law, unless specifically devised. They cannot, so far as the rules of descent are concerned, be distinguished from bonds for title to real estate, which go to the heir, unless devised by the will.

4. It is too well settled to require argument in support of the proposition, that only such real estate as a testator had at the time of the execution of his will, passes under it; for, unlike a will of personal estate, a devise operates on real estate owned at the date of the will. It is considered as a conveyance, having its inception at the time the will is executed, and is confined to the particular estate which the devisor then had to dispose of. Lovelass on Wills, 245.

It results from what we have said, that the Chancellor erred in the decree which he made. His decree is, therefore, reversed, and the cause is remanded, that further proceedings may be had in accordance with the views expressed in this opinion.

The course pursued in the case of Frazier v. Frazier's Ex'r., by the Court of Appeals of South Carolina, and which meets our approbation, will constitute a sufficient guide for carrying the trusts into execution.

As it was proper to obtain the opinion of this court for the direction, as well as protection of the administrator in the discharge of his duties, we think he should pay the cost of this case which have accrued in this court, to be allowed him on final settlement out of the estate he represents. Decree accordingly.