## HOOPER vs. HOOPER.

[BILL IN EQUITY FOR RECOVERY OF LEGACY AND SPECIFC PERFORMANCE OF TRUST FOR BENEFIT OF SLAVES.]

1. *When chancery court will compel execution of testamentary trusts in favor of slaves.* Where an executor is directed by his testator's will to carry certain slaves to a non-slaveholding State for the purpose of emancipation, the chancery court here will recognize his authority to execute the trust, and, if he voluntarily submits his administration to the court, might possess the power to enforce its execution ; but the slaves themselves cannot enforce the execution of such trust ; nor can they, after their removal by the executor to a non-slaveholding State, under an agreement between the legatees and distributees of the testator, maintain a bill here for the recovery of a pecuniary legacy, which the will directed the executor to deposit in a foreign bank for their benefit after their removal, when it appears that, prior to their removal, the executor had made a final settlement and distribution of the estate before the probate court, and had been discharged by its decree.

APPEAL from the Chancery Court of Dallas.

Heard before the Hon. JAMES B. CLARK.

THE original bill in this case was filed on the 25th March, 1853, by the appellees, (Harriet, *alias* Harriet Hooper, a free woman of color, and her six children,) against Zachariah L. Hooper and the sureties on his official bond as executor of John Hooper, deceased; and sought the recovery of a pecuniary legacy bequeathed to the complainants by the will of said John Hooper, and the specific performance by the executor of the trusts declared by the will in their favor. John Hooper died, in Dallas county, Alabama, in 1848. The material provisions of his will, which was duly admitted to probate by the probate court of said county, are as follows :

" 2. It is my wish, that all my just debts be paid, and that my brother, Zachariah L. Hooper, act as my executor.

" 3. It is my wish, that my executor, in the first place, after administering on my estate, or as soon as he can do so, take Harriet, a yellow woman, and her six children, (namely, Ellen, William, Mary Jane, Zachariah, Eliza

Ann, and Joseph,) to the State of Ohio, and free them there; settle them comfortably in the country, (not in a city,) and, after settling Harriet and her six children as above named, my executor is requested to place in some solvent bank in Ohio the sum of ten thousand dollars, to be used in the following manner—that Harriet and her six children are to be supported from the interest of the ten thousand dollars; the principle is not be used, unless Harriet marries—then she may draw her proportional part of the principal; and the same may be done with each child's proportional part, as they become of age or marry.

"4. It is my wish, that Harriet and her six children have all my beds and bed-clothing, and my set of knives and forks.

"5. My executor is requested to pay all the expenses of conveying and settling Harriet and her six children, as above named, out of my estate before a division takes place; after which, I wish him to give to his oldest daughter, Elizabeth Hooper, a little girl, about three years old, named Alice. Leathy and Clary are to be so allotted as to go to my brother, Henry Hooper. John is to be sold, and the money divided among my heirs. Dick is to be sold, if thirteen hundred dollars can be obtained for him, in order that he may remain in the State of Alabama. My property is to be equally divided between my brothers and sisters, with the exception of my brother, Zachariah L. Hooper; and as a compensation for his trouble, I will him a double interest in my estate, provided he carries my will into execution; and if not, he is to have but a fourth of one share."

The bill alleged, that the complainants were "resident citizens and free persons of color in the State of Ohio; that they were all the slaves of said testator at the time of his death; that they were removed to Ohio immediately after the death of said testator; that on the 18th February, 1850, "final settlement was made by said executor of the estate of said John Hooper, deceased;" that it appeared by this settlement, that the several brothers and sisters of the testator "had consented in writing, and repeated their consent in person and by their attorneys,

that complainants were and should forever hereafter be free—that said executor should retain for their use and benefit, out of each of said distributive shares, the sum of three hundred dollars, which being deducted from each of their legacies, and the sum of twelve hundred dollars being allowed to the executor as his commissions, a balance of $22,301 59 was left in the hands of the executor," which sum was distributed among said distributees, "and said executor was then and there discharged;" that this decree was not binding on the complainants, because they were not parties to the settlement; that said sum of eighteen hundred dollars, referred to in said settlement as being retained by the executor, was all that they had ever received from the estate of said testator; that the executor failed and refused to pay over to them, or to deposit for them in some bank in Ohio, the sum of money bequeathed to them by said testator; that he had not settled them in comfortable circumstances, as the will directed him to do; that all the other legatees had been paid in full, and had acknowledged satisfaction of record, and that all the debts of the estate had been paid. The prayer of the bill was for a specific performance of the trusts created by the will in favor of the complainants, the payment of the pecuniary legacies, with interest, and for general relief.

The executor answered the bill; demurring to it for want of equity, and for non-joinder and misjoinder of proper parties; alleging and insisting, that the provisions of the will in favor of the complainants, if not invalid, conferred a discretionary power of execution on him, which he was not willing to exercise without the consent of all the legatees; that they all agreed, "as a compromise of the whole matter, and as a gratuity on their part," that the sum of three hundred dollars should be retained by him out of each of their legacies, to be expended in the removal and settlement of the complainants in Ohio; that this was accepted by the complainant Harriet, in behalf of herself and her children, in full satisfaction of their claims under said will, if any they had, and, if they had none, then as a gratuity;" that respondent, "in the

exercise of the authority vested in him by this agreement, as well as by law," carried the complainants to Ohio, bought for them a house and lot, on which they were located comfortably and decently, and deposited the balance of the funds in his hands to their credit in a bank; and that in thus acting, "respondent in no wise acted as executor of said estate, but as one of the distributees, and as empowered by the others to so do for them."

The chancellor overruled the demurrer to the bill for want of equity, and held, on final hearing on pleadings and proof, that the complainants were entitled to recover the pecuniary legacy bequeathed to them by the testator, although they were carried to Ohio by the executor, after he had entered on the duties of the trust, under and by virtue of the agreement among the legatees; but he dismissed the bill as to the sureties of the executor, and ordered it to stand over that the other legatees might be brought in.

A supplemental bill was afterwards filed; bringing in Francis M. Hooper as a defendant; and alleging, that all the other legatees were non-residents, and had no property in this State. Francis M. Hooper filed an answer, adopting the answer of his co-defendant, Zachariah L. Hooper. A reference to the master was afterwards ordered, to ascertain the amounts which each of the defendants had received from the testator's estate, the amount which the complainants had received, the amount expended in their removal by the executor, the time of their removal, &c. The master reported, that the complainants were taken to Ohio "on or about the month of March, 1850;" that the amounts received by them, and expended by the executor in their removal, were substantially as above stated; and that each of the defendants had received from the estate, on the 18th February, 1850, the sum of $3,716 59. The chancellor, on final hearing, confirmed the master's report, and rendered a money decree against each of the defendants, for the amount received by them respectively from the estate, with interest from the time it was received.

The several decrees of the chancellor are assigned as error, by each of the defendants separately.

GEO. W. GAYLE, and WM. M. BYRD, for appellants.

JOHN T. MORGAN, *contra*.

RICE, C. J.—The law, as declared in Atwood's Heirs v. Beck, adm'r, 21 Ala. 590, puts emancipation by the owner of a slave, and by the owner's executor under the direction of the will, exactly upon the same footing, except as to the executor's liability to creditors. It proceeds upon such reasoning as the following: that as the owner, during his life, may lawfully carry his slave to a non-slaveholding State, for the purpose of there granting him his freedom, so, after his death, his executor may do the like thing, acting in *autre droit*, in execution of a trust declared by his will.—See Thompson v. Nowlin, 8 Iredell's Eq. Rep. 32.

From that position and reasoning it plainly follows, that in the case of a trust in a will, that a slave should be taken out of this State to a non-slaveholding State, and be there set free, the rule *cy pres* is not adopted or applied; that the court cannot order him to be carried abroad, for the purpose of emancipation; and that until he is carried, *in execution of the trust*, to the State to which the will directs him to be carried, he does not acquire the capacity of a free man, but remains subject to the disabilities of a slave. As the rule *cy pres* would not be adopted as against the owner, nor he be compelled by the court to carry his slave to another State for the purpose of emancipation, although he had declared in writing that he would so do; so, that rule will not be adopted as against the owner's executor, nor will he be compelled by the court, *at the instance and suit of the slave*, to carry him to the State to which the will directs him to be carried for the purpose of emancipation. The court of chancery will recognize *the authority* of the executor to execute the trust, and, if by *his bill he submits the administration* to that court, it might possess the power to enforce its execution, as a condition of giving its aid and relief to him. But the slave cannot enforce its execution by suit.—Abercrombie v. Abercrombie, 27 Ala. 489. The trust is one of that class which may be valid, and yet not capable of being enforced

against the trustee, by judicial tribunals.—Atwood v. Beck, *supra*.

It must be borne in mind, that "our law recognizes no other *status* than that of absolute freedom, or absolute slavery," (Abercrombie v. Abercrombie, *supra;*) and that the emancipation of a slave cannot, *by will*, be consummated in this State. Notwithstanding the direction in the will, that the slave be removed to a non-slaveholding State, and be there set free, the disabilities of the slave continue, until he is removed from this State. Such direction in the will confers no right whatever on the slave, until he is removed from this State to the non-slaveholding State, *in the execution of the trust declared by the will.* Until *such* removal, the trust as to his emancipation is inoperative ; and a bequest of money to him, or in trust for his benefit, cannot vest in him, nor be enforced by suit in his name.—Graves v. Allan, 13 B. Monroe, 190 ; Jones v. Lipscomb, 14 B. Monroe, 296.

The complainants in the case at bar were the slaves of John Hooper at the time he executed his will, and at the time of his death. At both those periods, they were in the State of Alabama, and remained in Alabama, as slaves, until after the will of said Hooper (who died in 1848, in Dallas county, Alabama) had been duly admitted to probate in the probate court of said county of Dallas, and until after the estate of said testator had been finally settled, his entire property, except the complainants, had been divided and distributed, and the executor discharged from his office, by the decree of said probate court.

It was by virtue of an agreement made between the free white legatees, at or shortly before said final settlement of the estate of the testator, that the complainants were not divided with the other property of the testator, but were removed from this State to Ohio.

Upon the facts as presented by the record, it is clear that, if the complainants are "free persons of color in the State of Ohio," as they allege in their bill, they did not obtain their freedom *under the will of the testator ; nor until after the final settlement of the estate, and the discharge of the executor from his office,* by the decree of the probate

court having jurisdiction to decree that final settlement and that discharge. Their removal from Alabama to Ohio was not by the executor *as executor;* for he had, before that, duly ceased to be executor; nor was it under or by virtue of *the will of the testator;* but it was after, and under and by virtue of the aforementioned agreement made between the free white legatees; and in making that removal, the former executor acted not as executor, but as the mere agent or servant of the parties to that agreement. Conceding, then, that the complainants are free, as they allege, they derived their freedom from that agreement. They have no other ground upon which to rest their claim to freedom. When they claim it *under that agreement,* as they must if they claim it at all, they must take it upon the terms therein specified, and not upon the terms of the will. And the terms of that agreement do not give any support to the claim to the $10,000, or to any other claim asserted here by their bill, but are inconsistent with such claim.

Before the complainants acquired their freedom or any civil rights, and whilst they and their incapacities as slaves were continuing in Alabama, the fund in which they here claim to participate was distributed amongst the free white legatees by the final decree of said probate court in the exercise of its jurisdiction. That final decree was made in February, 1850. The bill was not filed until March, 1853,—more than three years after said final decree. No fraud or mistake in obtaining or rendering that final decree is shown. Upon the facts as they appear in the record, we deem it clear, that even if the complainants, under the aforementioned agreement, acquired their freedom after such final decree, such subsequent acquisition of freedom cannot confer on them a right to enforce the claim they here make to a participation in the fund or property which was distributed by final decree as aforesaid before they became free, and more than three years before they filed their bill to enforce their claim.

The decree of the chancellor is erroneous, and is reversed; and this court, proceeding to render such judgment as the chancellor should have rendered, doth order,

adjudge, and decree, that the complainants' bill be dismissed, and that Harriet Hooper and her security for costs pay the costs of the court below, and that Harriet Hooper pay the costs of the appeal to this court, for which execution may issue.