## CRESWELL'S EXECUTOR *vs.* WALKER.

[BILL IN EQUITY BY EXECUTOR, FOR INSTRUCTIONS IN EXECUTION OF TRUSTS.]

1. *Validity of testamentary trust for emancipation of slaves at their election.*— A testamentary trust for the emancipation of slaves, the execution of which is made to depend on the election of freedom by the slaves themselves, is void, because they have not the legal capacity to make the election; and the same principle applies, where the executor is directed to carry the slaves, for the purpose of emancipating them, "to some non-slaveholding state, or to the republic of Liberia, as the said slaves may prefer."

APPEAL from the Chancery Court of Greene.
Heard before the Hon. JAS. B. CLARK.

THE bill in this case was filed by the executor of John T. Creswell, deceased, against Mrs. Zernula Walker, and others, as legatees and heirs-at-law of said testator; and sought the direction and instructions of the court, as to the construction of the testator's will, and particularly as to the validity and execution of the trusts contained in the fourth clause, which was in the following words: "It is further my will and desire, that my faithful slaves, Tom, Dublin, Ann, and Maria, be liberated and set free; and to effect that object, my executor will have them taken, at the expense of my estate, to some non-slaveholding State, or to the republic of Liberia, as the said slaves may prefer, there to be free, and will furnish each of them such an outfit, out of my estate, as, in the judgment of my executor, will render them comfortable. But, should said slaves, or any one or more of them, prefer to remain in slavery, then I do hereby, in that event, will and bequeath said slaves, or such of them as prefer to remain in slavery, to my sister, Zeuly Walker, requiring her to will and bequeath said slave or slaves, at her death, to such person or persons as she may believe will treat them with kindness and humanity. If some of them prefer to remain, my executor

will send those of them who will go,·and furnish an outfit for them." The will was executed and ;published on the 4th October, 1856, in Greene county, the ·place of the testator's residence; and he departed this life a few .days afterwards. The will was duly admitted to probate, and letters testamentary were granted to .Samuel L. Creswell, who was therein appointed executor. The executor sold the lands and perishable property, paid all the debts and specific legacies, and distributed the estate according to the provisions of the will; only keeping the slaves mentioned in the fourth clause, and retaining in his hands money enough to provide for their expenses and outfit. In his bill he asserted, that the slaves had frequently expressed ;to ;him their desire to be emancipated, and had designated the country to which they wished to be carried; and declared his readiness and willingness to execute the trusts in their favor, if he could legally do so. The defendants filed answers, admitting all the facts alleged in the bill, but insisting that the trusts for the benefit of .the slaves were void. On final hearing, on bill, answers, and. agreed .facts, the chancellor held, on the authority of .Carroll and .Wife v. Brumby, (13 Ala. 102,) that the trusts for .the benefit of. the slaves were void, and dismissed the bill, at the costs of the estate; and his decree is now .assigned as error.

Wm. P. Webb, for the appellant.—The fourth clause of the testator's will creates a valid trust, which the executor is bound to execute.—Atwood v. Beck, 21 Ala. 590; Abercrombie v. Abercrombie, 27 Ala. 489; 8 Iredell's Eq. 253; 9 Humph. 616; 19 Geo. 35; 4 Leigh, 252; 12 Grattan, 117. What was .said to the contrary in the case of Carroll v.. Brumby, (13 Ala. 102,) must be regarded as mere dictum,. and is not sustained by the authority cited from 6 Porter; 269: and the case itself is opposed to the entire current of authority in other southern States.—See cases above cited; also, 6 Sm. & Mar. 93; 5 How. Miss. 305; 10 B. Monroe, 70; 2 Hill's Ch. 305; 6 Randolph, 654. Even if that case be adhered to, as a correct exposition of the law, the trusts

in this case must be held valid; for the testator first directs his executor to emancipate the slaves, and then gives the slaves the election to defeat the bequest by remaining in slavery; and if they have not the legal capacity to make such election, the condition is void, and the trust stands unaffected by it.—*Osborne v. Taylor*, 12 Grattan, 117; 2 Williams on Executors, (4 Amer. ed.) 1084–86; 3 Vesey, 325; 1 Jarman on Wills, 680–84.

Jas. D. Webb, *contra.*—This court has expressly decided, that slaves have not the legal capacity to choose between freedom and slavery.—*Carroll v. Brumby*, 13 Ala. 102. That decision is founded on sound legal principles; and in the cases to the contrary, cited for the appellant, the question was not raised in the argument of counsel, and seems to have been assumed without consideration by the court. In this case, the will gives the slaves the right to elect between freedom and slavery, and to choose the country to which, if they elect freedom, they shall be removed; and the executor cannot carry out the trust, according to the provisions of the will, unless he is governed by their wishes, and conforms to their election.

R. W. WALKER, J.—In *Carroll and Wife v. Brumby*, (13 Ala. 102,) the testator had by his will declared, that certain of his slaves should be permitted to go to Africa, their passage to be paid, &c.; but, if they desired to remain subject to his daughter, as they had been to him, they should be permitted to do so; but in no event to be sold, or deprived of this privilege, either before or after the death of his said daughter. "Should they, or any, or all, prefer not to emigrate, then, in that event, they shall be subject to my daughter, as they are to me." In passing upon this will, this court held, that the testator intended to give the slaves the option of freedom or servitude, but *that they had not the legal capacity to make the choice;* and that, the bequest of freedom being void, the title to the slaves was vested in the daughter. The same question has never since

arisen in this court; and we are now asked to reconsider it, because, as is alleged, the decision is opposed to the current of authorities upon the subject, has no solid foundation of reason to support it, and appears to have been made without a special discussion of the principle involved.

It is true that many cases may be found, which silently recognize the principle, that a bequest of freedom, which is otherwise valid, is not rendered void by the fact, that the election of freedom by the slave is the declared condition on which it is to take effect. The courts of North Carolina, South Carolina, Georgia, Mississippi, Kentucky, and Tennessee, have all treated as valid bequests which provided for an election by slaves of freedom or servitude. *Washington v. Blunt*, 8 Ired. Eq. 253 ; *Jordan v. Bradley*, Dudley's R. 170 ; *Frazier v. Frazier*, 2 Hill's Ch. 305 ; *Clcland v. Waters*, 19 Geo. 35 ; *Ross v. Vertner*, 5 How. Miss. 305 ; *Leech v. Cooley*, 6 Sm. & M. 93 ; *Graham's Ex'r v. Sam*, 7 B. Monroe, 403 ; *John v. Moreman*, 8 B. Mon. 100 ; *Adams v. Adams*, 10 B. Mon. 20 ; *Isaac v. McGill*, 9 Humph. 616 ; *Wade v. Am. Col. Society*, 7 Sm. & M. 694.

Mr. Cobb, in his work upon the law of negro Slavery, notices the suggestion made in *Carroll v. Brumby, (supra,)* that a slave is incapable of making a choice between freedom and slavery, and says in reference to it : "The suggestion has not been approved by other courts, and we cannot see the force of it. The theory of a complete annihilation of will in the slave, is utterly inconsistent with all recognition of him as a person, especially as responsible criminally for his acts."—Cobb on Slavery, § 363.

Notwithstanding this long array of authorities, apparently in conflict with it, we are persuaded that the principle announced by this court in *Carroll v. Brumby (supra)* is a sound one ; and that any trust for emancipation, in the execution of which the election of the slave between freedom and servitude is prescribed as a necessary step, must fail, because slaves have not the legal capacity to make the election.

It is a remarkable fact, and one which may be thought

to militate against the opinion we have just expressed, that in none of the numerous cases we have cited, except *Cleland v. Waters*, (19 Geo. 35,) does it appear that the question as to the legal capacity of slaves to make such election, was distinctly made by counsel, or fully considered, or expressly adjudged by the court. Hence we have spoken of these cases as silently recognizing the validity of bequests providing for an election by slaves of freedom or servitude. The legal capacity of slaves to make such election has been rather assumed than settled in them. Consequently, with the single exception just mentioned, they have not the weight which would attach to cases in which the question had been directly made and argued by counsel, and fully considered, and distinctly decided by the court.

Assuming, then, that the trust in this case cannot be executed in the manner pointed out by the testator, unless the slaves choose to be emancipated, the question is, whether the making of this election is an act which slaves have the legal capacity to perform. Can a master, by his will, clothe his slaves with the irrevocable power of determining and changing, by an uncontrollable act of their will, their own civil *status*? Before we can give an affirmative answer to these questions, we must be prepared to say, that a master may confer upon slaves the legal right to acquire for themselves, by their own unforced and unrestrainable act, benefits and privileges inconsistent with the condition of slavery, and, at the same time, and by the same act, to divest the property rights of others.

So far as their civil *status* is concerned, slaves are mere property, and their condition is that of absolute civil incapacity. Being, in respect of all civil rights and relations, not persons, but things, they are incapable of owning property, or of performing any civil legal act, by which the property of others can be alienated, or the relations of property, or the legal duties or trusts in regard thereto, in any wise affected. In a late case, the supreme court of North Carolina used this language: "Under our system of

law, a slave can make no contract. In the nature of things he cannot. He is, in contemplation of ' law, not a person for that purpose. He has no legal capacity to make a contract; *he has no legal mind.* He is the property of his master, and all the proceeds of his labor belong to his owner. 'If property is devised or given to him, the devise or bequest is void, and the personalty given either belongs to the giver, or becomes the property of the owner. A slave has no legal *status* in our courts, except as a criminal, or as a witness in certain cases."—*Butler v. Faulk,* 4 Jones" L. R. 233.

Chancellor Kent, in speaking of the laws of the southern States on the subject of negro slavery, says: "They are, doubtless, as just and as mild as is deemed by those governments to be compatible with the public safety, or with the existence of that species of property; and yet, in contemplation of their laws, slaves are considered, in some respects, as things, or property, rather than persons, and are vendible as personal estate. They cannot take property by descent or purchase; and all they find, and all they hold, belongs to the master. They cannot make lawful contracts, *and they are deprived of civil rights.*"—2 Kent, 253. So, in *Emerson v. Howland,* (1 Mason's R. 45,) Judge Story says, that the slave "*has no civil rights or privileges.*"

In the case of *Girod v. Lewis,* (6 Martin's R. 559,) it is said, that slaves have no legal capacity to assent to any contract; that whilst, with the consent of the master, they have the moral power to enter into such a connection as that of marriage, the marriage, whilst they remain in a state of slavery, could be productive of no civil effect, *because slaves are deprived of all civil rights.*

The numerous decisions in which it has been held, that a promise made to a slave, or for his benefit, is not enforceable in any legal tribunal; that a slave cannot sue or be sued, except that he is clothed with the statutory right of instituting a suit for freedom; that he cannot acquire or own property; that he has no legal capacity to make a contract, not even that of marriage,—all proceed upon the

Creswell's Executor v. Walker.

fundamental idea, that our slaves have no civil or social rights, and are incapable of performing by their own volition, and as a matter of right, any civil act which can be made the lawful foundation of vesting new rights in themselves, or of divesting the existing rights, or determining in any respect the legal duties of others.

According to the legal conception of slavery, as it exists in the southern States, a human being endowed with civil rights cannot be a slave. The possession of these rights is incompatible with the condition of slavery, and any attempt to confer them upon a slave, *durante servitute*, is an effort to accomplish what is legally impossible. Our law recognizes no other *status* than that of absolute freedom, or absolute slavery ; and the courts have uniformly rejected, as a legal solecism, the idea that a slave, while a slave, can be invested with civil rights or legal capacity.—*Abercrombie v. Abercrombie*, 27 Ala. 494. Therefore, any attempt of a master to clothe his slave with the power to perform an act, which involves the exercise of civil rights and legal capacity, must, in the nature of things, fail.

It seems too clear for dispute, that, where a bequest is made to depend upon the declaration by the legatee of his election to accept the gift, the making of this election is a civil act. If a grant of an estate be made to a free person, on condition that he would elect a trade.; or, if a bequest be made of either one of two named slaves the legatee may choose, if he will elect between the two, it could not be seriously contended, that the making of the election would not be a civil act. Surely that is a civil act, the performance of which either creates or divests valuable rights, or imposes a legal duty, or perfects a trust, which courts may enforce. So, when the act of a slave, in choosing between freedom and slavery, is a necessary step in the execution of a trust, the election is a civil act, and the trust is void, because it presupposes and requires that a slave, *durante servitute*, shall be invested with privileges which do not and cannot belong to one in his condition. Such a bequest is an effort on the part of the testator to impart to slaves

rights which belong exclusively to freemen,—thus placing them in that middle state between absolute freedom and absolute slavery, which our law, upon grounds of paramount public policy, refuses to recognize as legally possible.

It is true that slaves are human beings, and are endowed with intellect, conscience, and will. Their moral and intellectual qualities determine, to a considerable extent, their value, and are often looked to in ascertaining the rights and liabilities of others in relation to them as articles of property.—See *Young v. Burton*, 1 McMull. Eq. 255; *Bean v. Summers*, 13 Gratt. 412; *Boyce v. Anderson*, 2 Peters, 150. Being endowed with intelligence, conscience, and volition, they are deemed capable of committing crime; and the same public policy which, so far as the performance of civil acts is concerned, refuses to consider them as persons, gives them a criminal *status*, and recognizes them as persons in respect of acts involving criminal responsibility. Because they are rational *human beings*, they are capable of committing crimes; and, in reference to acts which are crimes, are regarded as *persons*. Because they are slaves, they are necessarily, and, so long as they remain slaves, incurably, incapable of performing civil acts; and, in reference to all such, they are *things*, not persons.

This obvious distinction is overlooked by Mr. Cobb, in his criticism of the decision in *Carroll v. Brumby*.—See Cobb on Slavery, § 363. So far as civil acts are concerned, the slave, not being a person, has no legal mind, no *will* which the law can recognize. But, as soon as we pass into the region of crime, he is treated as a person, as having a legal mind, a will, capable of originating acts for which he may be subjected to punishment as a criminal. Considered in his relation to this latter class of acts, the theory of a complete annihilation of will in the slave, is wholly unfounded; while in relation to the former class of acts, it is entirely consistent, and, indeed, is the only theory that can be consistent, with the fundamental idea of negro slavery as it exists with us—namely, that in respect of civil rights

and legal capacity to perform acts of a civil nature, the slave is not a person, but a thing.

It must not be supposed from what has been said, that our laws fail to afford slaves adequate protection against oppression or injury. This protection is not only secured by the fundamental law, the constitution of the State, (art. 6, §§ 2 and 3,) but many statutes have been enacted with a view to the same end. The law punishes an assault and battery upon them by any third person; prohibits the infliction upon them of cruel or unusual punishment; punishes the master, or other person standing in that relation, who fails to provide the slave with a sufficiency of healthy food, or necessary clothing, or to provide for him properly in sickness or old age, or treats him in any other way with inhumanity; and the master cannot relieve himself of the legal obligation to supply the slave's necessary wants, by voluntarily putting the slave away from him, without providing some one to occupy the relation of master to him. The law also secures to slaves the right of trial by jury, for all offenses above petit larceny, and provides them with counsel, in certain cases, at the public expense.—See *Atwood v. Beck*, 21 Ala. 609; 4 Ala. 66; Code, §§ 3297, 3300, 3316, 3319, 3329.

There is nothing inconsistent with the views expressed in this opinion, in the fact that a master may make his slave an agent. In that case, the acts of the slave are but the acts of the master; and this it is which gives them all their validity and effect. Hence it has been held, that a slave cannot act as the agent of any person but his master.—*State v. Hart*, 4 Ired. 246. "The agency of the slave, in truth, instead of affording any argument in behalf of the existence of his social or civil rights, is but an instance or illustration of the complete dominion of the master; of his entire control over all the powers and faculties of the slave; and of his right, consequently, to use him as an instrument or medium through which to make or execute contracts with third persons."—*Bailey v. Poindexter*, 14 Grattan, 132, 198.

In the case just cited, the question of the legal capacity
of slaves to choose between freedom and slavery under-
went a most elaborate discussion by eminent counsel, and
received the fullest consideration from the court; and the
conclusion attained was, that a bequest of freedom, depen-
dent upon the election of the slaves to be free, is void,
because slaves have no legal capacity to make the election.
To the learned arguments of the counsel, and the able
opinion of Daniel, J., in that case, we are chiefly indebted
for the line of argument above presented.  On that occa-
sion, the question seems to have received for the first time
the deliberate consideration which its great importance
demands; and under these circumstances, the opinion pro-
nounced is fairly entitled to outweigh a score of cases on
the opposite side, where the point seems to have been
rather taken for granted, than expressly decided.—See,
also, *Williamson v. Coulter*, 14 Gratt. 394.

It is said, however, that the trust in this case is not de-
pendent on the election of the slaves to be free, but is per-
fect without it; that the election which they are authorized
to make, is the election to remain in slavery; and that this
is prescribed, not as a necessary step in the execution of
the trust, but as a condition by which it may be defeated.
The argument is, that the testator first creates a valid trust,
by directing his executor to remove the slaves for the pur-
pose of emancipating them, and then provides, as the con-
dition which shall defeat it, the election of the slaves to
remain in slavery.  As slaves cannot, by any voluntary act
of theirs, defeat a complete, any more than they can per-
fect an incomplete trust, it would follow, if this view of
the will is correct, that the condition would be void, be-
cause impossible, and the trust would stand unaffected by it.

We will not inquire, whether, taking the whole will
together, it does not appear that the election of the slaves
to be free, is an act essential to the execution of the trust
in the manner prescribed by the testator.—See *Williamson
v. Coulter*, 14 Gratt. 394.   For, however that may be, it is
obvious that the trust is made to depend on the election by

the slaves of the place to which they are to be removed. The direction is, that the executor shall have them "taken to some non-slaveholding State, or to the republic of Liberia, *as the said slaves may prefer.*" In trusts of this character, the rule *cy pres* is not adopted or applied; and until the slaves are carried, in execution of the trust, *to the State or country to which the will directs* them to be carried, they do not acquire the capacity of freemen, but remain subject to the disabilities of slaves.—*Hooper v. Hooper,* 32 Ala. 673.

If the direction is for the removal of the slaves to a particular State, and the execution of the provision becomes impossible, from the refusal of such State to admit free negroes within its limits, the bequest fails.—*Nancy v. Wright,* 9 Humph. 597; *Adams v. Bass,* 18 Geo. 130. The effect of this will is, that the executor is to take the slaves to that one of two named places which they may select. Unless they make the selection, the direction fails. Unless the executor takes the slaves to a place selected by them, he does not take them to the place directed by the testator. The trust cannot be executed, in the manner provided by the will, unless the executor consults with the slaves, and is governed, as a matter of legal duty, by their will. As their election of the place to which they shall be taken is a condition, the performance of which is essential to the execution of the trust in their favor, the making of that choice is as much a civil act as an election between freedom and slavery. The case of *Cleland v. Waters,* (19 Geo. 35,) proceeds upon the idea, that in principle there is no difference between the capacity of slaves to choose the place to which they shall be taken, and their capacity to elect whether they will remain slaves or be emancipated. We can perceive no distinction. As the trust cannot be executed, according to the directions of the testator, unless this condition (the selection by the slaves of the place to which they shall be removed) is performed, and as the condition is one which slaves are legally incapable of performing, the trust is void.

Decree affirmed.